# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James N. Brown, Jr.,                                    Civ. No. 18-219 (DSD/BRT)

        Plaintiff,

v.                                                      **REPORT AND**
                                              **RECOMMENDATION**

Associate Warden G. Cooper; Ken Hyle,
Asst. Director; Sara Revell, Regional Director;
Kathleen Kenney, Gen. Counsel; L. LaRiva, Warden;
L. Janssen, R.N.; C. Orum, Unit Manager; R. Woltman,
Unit Counselor; FNU Sanson; A. Cossette, Unit Manager;
D. Holbus, Lieutenant; C. Stromberg; FNU Hare;
Peter Arroyo; Charles Slater, MD; Sheila Hadaway, MD;
Misbah Baqir, MBBS; Mayo Clinic; M. Porter, R.N.,
Supervisor; T. Miller, Captain; and the United States of
America,

        Defendants.

James Brown, Reg. No. 44935-424, Federal Medical Center, P.O. Box 4000, Rochester, MN 55903, *pro se* Plaintiff.

Andrew Tweeten, Esq., and Erin M. Secord, Esq., Assistant United States Attorneys, counsel for Defendants.

Vanessa J. Szalapski, Esq. and William R. Stoeri, Esq., Dorsey & Whitney LLP, counsel for Defendant Mayo Clinic.

BECKY R. THORSON, United States Magistrate Judge.

    *Pro se* Plaintiff James Brown brings claims related to his medical treatment at the

Federal Medical Center in Rochester, Minnesota. (Doc. No. 21, Am. Compl.) Plaintiff

alleges that the Defendants in this action violated his federal and constitutional rights in a

variety of ways, including by giving him insufficient supplemental oxygen, confiscating

his motorized wheelchair and forcing him to use a manual wheelchair, and refusing his

request for a lung transplant.[1] Plaintiff brings claims against two groups of Defendants:

the Federal Defendants[2] and the Mayo Defendants.[3] (*See id.*) Both groups of Defendants

move to dismiss, or in the alternative, for summary judgment. (Doc. Nos. 63, 82.) For the

reasons stated below, this Court recommends that the motions be treated as summary-

judgment motions and be granted.[4]

---

[1]    Plaintiff filed a motion for a preliminary injunction requesting, among other relief, an order enjoining Defendants from "continuing to deny the plaintiff an evaluation for a lung transplant, and further from denying the plaintiff placement on the transplant list to receive a lung transplant." (Doc. No. 73, 7/10/18 Report and Recommendation 2; *see also* Doc. No. 7.) This motion was denied on August 6, 2018. (Doc. No. 78.) Plaintiff filed another motion for a preliminary injunction on August 30, 2018, which was denied on September 28, 2018. (Doc. Nos. 124, 129, 131.)

[2]    Gregory Cooper, Associate Warden; Ken Hyle, Assistant Director, General Counsel; Kathleen Kenney, Assistant Director/General Counsel (retired); Sara Revell, Regional Director; Leann LaRiva, Warden (retired); Todd Miller, Captain; Chad Orum, Unit Manager; Andrea Peyla-Cossette, Unit Manager; Rhonda Woltman, Correctional Counselor; Mary Porter, Nursing Supervisor; Leesa Janssen, Registered Nurse; Derek Holbus, Lieutenant; Chad Stromberg, Correctional Officer; Jason Hare, Lieutenant; Charles Slater, Medical Officer; Peter Arroyo, Occupational Therapist; and Sheila Hadaway, Clinical Director. Plaintiff also sued "Sanson," who cannot be identified. The United States of America was substituted as a Defendant with respect to Plaintiff's claim under the Federal Tort Claims Act. (Doc. No. 75.)

[3]    Mayo Clinic and Dr. Misbah Baqir.

[4]    Both groups of Defendants present facts outside the pleadings in support of their motions. In response, Plaintiff does not object to treating Defendants' motions as summary-judgment motions. (*See* Doc. No. 133, Pl.'s Mem.) Plaintiff also does not argue that he is unable to present facts essential to justify his opposition to Defendants' motions. *See* Fed. R. Civ. P. 56(d). Therefore, this Court will treat the motions as motions for summary judgment.

# I.    Background

## A.    Parties to this Litigation

Plaintiff is serving a 120-month term of imprisonment for Conspiracy to Distribute Heroin. (Doc. No. 116, Declaration of Jake Bush ("Bush Decl.") ¶ 3, Ex. A.) He arrived at FMC Rochester on April 19, 2016, as a transfer from the Federal Correctional Institution in Pekin, Illinois. (Doc. No. 86, Declaration of Sheila Hadaway ("Hadaway Decl.") ¶ 4, Ex. A.)

The Federal Defendants are current or former employees of the Federal Bureau of Prisons, all of whom were acting within the scope of their employment at the time of the conduct alleged in the Amended Complaint. (Doc. No. 26, Declaration of Ana Voss.) The Mayo Defendants are the Mayo Clinic and Dr. Baqir, who is employed at the Mayo Clinic.

## B.    Allegations Against the Federal Defendants

Plaintiff is a thirty-five-year-old African-American male who has been diagnosed with Acute Fibrinous Organizing Pneumonia ("AFOP") secondary to Diffuse Alveolar Damage Disease ("DAD"), as well as Avascular Necrosis ("AVN"). (Am. Compl. 4.) He claims that he is confined to his bed or wheelchair (motorized scooter) for more than fifty percent of his waking hours and requires assistance with most of his daily living activities. (*Id.*)

Plaintiff alleges that upon his arrival at the 9/3 Housing Unit at FMC-Rochester, Defendant Stromberg forced Plaintiff to be strip searched without any medical assistance. (*Id.* at 5.) Plaintiff also claims that Defendants Stromberg and Porter placed him in a

Special Housing Unit ("SHU") cell without supplemental oxygen, which is required for his medical needs. (*Id.*) When Plaintiff asked for an administrative remedy form to file a grievance for this conduct, Defendant Hare allegedly ordered Defendant Stromberg to write an incident report against Plaintiff for disobeying a direct order. (*Id.*) Also according to Plaintiff, Defendant Janssen issued a "false and misleading" incident report after being told by Defendant Woltman that Plaintiff had submitted an administrative remedy against Defendant Janssen for staff misconduct. (*Id.* at 4.)

Plaintiff further alleges that he was moved from the medical SHU to the general population SHU, even though Defendants Dr. Hadaway and Dr. Slater knew that Plaintiff's medical needs could not be met in the general population. (*Id.* at 6.) Plaintiff claims that he lost consciousness and suffered severe chest pain and shortness of breath due to the lack of oxygen. (*Id.* at 6–7.) Plaintiff claims to have been in the general population SHU for thirty days. (*Id.* at 7.)

Plaintiff also alleges that his motorized cart was seized, and when he was released from the general population SHU, he was only given a manual wheelchair, which was difficult to use because of the pain in his shoulders due to AVN. (*Id.* at 7–8.) As a result, Plaintiff claims that he was forced to get around "the best way he could, and in sub-zero temperatures." (*Id.* at 7.) Plaintiff also alleges that other property was seized, leaving him with nothing to keep himself warm. (*Id.*)

In addition, Defendant Dr. Slater allegedly ignored the Mayo Clinic's recommendation in August 2017 for an MRI regarding Plaintiff's AVN, instead ordering an x-ray. (*Id.*) Also, under Defendant Dr. Hadaway's supervision, Defendant Slater

allegedly denied Plaintiff pain medication because he was a drug seeker. (*Id.* at 8.) Defendants Dr. Hadaway and Dr. Slater also allegedly blocked Plaintiff's access to a lung transplant. (*Id.*)

Finally, Plaintiff alleges that Defendants LaRiva, Hyle, and Kenney wrongfully denied his request for a compassionate release. (*Id.* at 9.) He claims that the BOP grants compassionate releases to white and Hispanic inmates at a greater rate than African-American prisoners. (*Id.*) And since the filing of this lawsuit, Plaintiff alleges that he has been "continually harassed, targeted and threatened with being transferred and more time in the SHU" if he doesn't stop filing grievances. (*Id.* at 9–10.)[5] Plaintiff claims that Defendant Miller confronted him in the dining hall and asked "What is this that you are suing me for 7 million dollars? Who do you think you are?" (*Id.* at 9.)

### C.    Allegations Against the Mayo Defendants

Plaintiff alleges that he received treatment at the Mayo Clinic from Dr. Baqir, that Dr. Baqir recommended in August 2017 that Plaintiff should have an MRI and should see an orthopedist, and that Dr. Baqir's recommendation was ignored. (*Id.* 7–8.) Plaintiff also alleges that the Mayo Defendants, along with Defendants Dr. Slater, Dr. Hadaway, and the BOP "have consistently blocked" him from "receiving a lung transplant, without such the plaintiff will soon die." (*Id.* at 8.) Plaintiff asserts that because he is incarcerated,

---

[5]    Plaintiff filed this action on January 25, 2018, and filed a motion for leave for amend on March 29, 2018. (Doc. No. 18.) Plaintiff's Amended Complaint was filed on April 13, 2018. (Doc. No. 21.)

he has been "constantly told that he would not get a transplant while in BOP custody."
(*Id.* at 8–9.)

### D.     Plaintiff's Medical History at FMC-Rochester

#### 1.     Plaintiff's Medical Conditions

When Plaintiff arrived at FMC Rochester in April 2016, he had ongoing problems with coughing, shortness of breath, tachycardia, hypertension, and weight loss, believed to be caused by interstitial lung disease of an unknown origin. (Hadaway Decl. ¶ 5, Ex. B.) He also suffered from hyperthyroidism, diabetes, gallstones, rashes, and a hernia. (*Id.*) Plaintiff experienced shortness of breath with minimal exertion and used supplemental oxygen. (*Id.*) After his initial examination of Plaintiff, Defendant Dr. Slater ordered numerous labs, a chest x-ray, CT Scan, a Holter Monitor, and consultations with Pulmonology, Rheumatology, and Endocrinology at Mayo Clinic. (*Id.*) Over the next year, Plaintiff underwent extensive evaluations at Mayo Clinic and was ultimately diagnosed with acute fibrinous organizing pneumonia of uncertain etiology. (*Id.* ¶ 6, Ex. C.) His condition was eventually stabilized with medications, including CellCept, an immunosuppressant, and prednisone. (*Id.*)

#### 2.     Supplemental Oxygen

Patients who need supplemental oxygen can receive it via wall oxygen, an oxygen concentrator, and a portable oxygen concentrator. (Hadaway Decl. ¶ 7.) At FMC Rochester, the oxygen flow can be set at a rate of up to fifteen liters per minute for a wall oxygen unit, six liters per minute on an oxygen concentrator, and two liters per minute on a portable oxygen concentrator. (*Id.*) Two housing units—9/2 and 9/3 inpatient medical

units—have wall oxygen concentrators. (*Id.*) The goal of supplemental oxygen is to keep the patient's oxygen saturation levels above 90%. (*Id.*)

As Plaintiff's acute fibrinous organizing pneumonia stabilized with treatment, Mayo Clinic encouraged FMC Rochester to evaluate his need for supplemental oxygen to get him on lower rates yet still maintain appropriate oxygen saturation levels. (Hadaway Decl. ¶ 8, Ex. D.) Defendant Dr. Slater noted on March 10, 2017, that Plaintiff's dependence on oxygen might be psychological, and therefore, he prescribed Ativan as needed to assist with any anxiety Plaintiff would experience during the downward titration. (Hadaway Decl. ¶ 8, Ex. C at 4.) From August 2017 to December 2017, Plaintiff's oxygen saturations remained at or above the 90% target saturation rate. (Hadaway Decl. ¶ 9, Ex. E.)

On October 19, 2017, Plaintiff submitted an electronic request to staff asking Defendant Dr. Slater why he was removed from wall oxygen. (Hadaway Decl. ¶ 10, Ex. F.) Defendant Dr. Slater responded to him, indicating that his oxygen concentrator supplied him with a sufficient oxygen flow of at least two liters per minute to maintain oxygen saturations of approximately 96%–100% and therefore, he did not need the additional oxygen flow provided by the wall oxygen units. (*Id.*) By letter dated October 31, 2017, Mayo Clinic agreed with Dr. Slater that Plaintiff did not need oxygen at rest, he primarily need it upon exertion. (Hadaway Decl. ¶ 11, Ex. G.)

When Plaintiff was placed into the SHU on December 4, 2017, he was initially provided an oxygen concentrator, which was kept outside his locked cell door with the oxygen tubes running under the door. (Hadaway Decl. ¶ 12.) His oxygen saturations

remained above 90% during this time. (*Id.* ¶ 12, Ex. E at 3–4.) Further, even though staff may not have taken oxygen saturation levels, they repeatedly observed Plaintiff wearing oxygen nasal cannula while he was in the SHU. (*Id.* ¶ 12, Ex. H.)

On December 18, 2017, another doctor evaluated Plaintiff as part of a chronic care clinic. (Hadaway Decl. ¶ 13.) Plaintiff reported that he felt short of breath without his oxygen, but after she removed his supplemental oxygen for several minutes, his oxygen saturation remained at 100% on room air. (*Id.*, Ex. I.) Because the doctor believed that Plaintiff's concerns about shortness of breath were related to anxiety, she consulted with Mayo Clinic Pulmonology regarding the discontinuation of oxygen at rest, and they both agreed to discontinue oxygen at rest. (*Id.*) The doctor ordered 2L of oxygen with exertion and pulmonary function testing to assess the lowest concentration of nasal cannula oxygen by Plaintiff for walking. (*Id.*) The oxygen concentrator that had been located outside Plaintiff's cell door was removed, and Plaintiff would be given a portable oxygen concentrator available to him for recreation and showers. (Hadaway Decl. ¶ 14, Ex. J.)

### 3.    Placement in the General Population SHU

Because FMC Rochester houses medically ill inmates who may need twenty-four hour nursing care, the institution has a limited number of SHU beds for medical inmates on the 9/3 inpatient unit in addition to the general population SHU in Building 2. (Hadaway Decl. ¶ 15.) Inmates in the general population SHU are seen by nurses during rounds, and they can bring any medical complaints to the attention of the correctional officers between rounds. (*Id.*)

On December 4, 2017, Correctional Services staff determined Plaintiff needed to be placed in SHU. (Hadaway Decl. ¶ 16.) At the time, Plaintiff was housed on the 9/3 unit. (*Id.*) However, Defendant Dr. Slater approved Plaintiff's placement in the general population SHU in Building 2 rather than the 9/3 SHU cells. (*Id.*) This is because, as previously mentioned, Plaintiff's oxygen needs could be met through an oxygen concentrator outside his cell door or via a portable concentrator upon exertion. (*Id.*) He did not need access to the higher-flow wall oxygen units on 9/2 or 9/3. (*Id.*) Also, Plaintiff was independent with his activities of daily living, such as eating, bathing and transferring from his wheelchair to his bed. (*Id.*, Ex. H at 6.) His medical needs could be met in the general population SHU, which kept the limited number of medical SHU cells on the 9/3 unit open for more medically ill inmates who, unlike Plaintiff, needed assistance from the nurses with their activities of daily living. (Hadaway Decl. ¶ 16, Ex. K.)

### 4.    Electric Wheelchair

Plaintiff was issued an electric wheelchair on May 2, 2017, which he used until he was placed in the SHU on December 4, 2017. (Hadaway Decl. ¶ 20, Ex. O.) When an inmate who has been issued an electric wheelchair is placed in the SHU, the electric wheelchair is discontinued as the inmate does not have a need for it because the inmate is primarily confined to their cell. (*Id.* ¶ 21.) Plaintiff was issued a manual wheelchair when he was released from the SHU on January 3, 2018. (*Id.* ¶ 22, Ex. P.) Defendant Occupational Therapist Arroyo did not issue an electric wheelchair because Plaintiff

needed to be evaluated by his Physical Therapist to determine if there was still a clinical need given his improved pulmonary function. (*Id.*)

Plaintiff met with his Physical Therapist on January 6, 2018. (Hadaway Decl. ¶ 23, Ex. Q.) She noted that Plaintiff had initially used the electric wheelchair for mobility due to significant oxygen desaturation, but his lung function had improved. (*Id.*) Upon evaluation, Plaintiff was able to ambulate 200 meters in six minutes, and therefore, she concluded that it was unlikely he would be able to ambulate across the compound in the time allotted for inmate movement. (*Id.*) The Physical Therapist recommended Plaintiff use a walker in his housing unit and an electric wheelchair on the compound. (*Id.*) Plaintiff received an electric wheelchair that day. (*Id.*) Therefore, Plaintiff did not have access to an electric wheelchair while he was in SHU, from December 4, 2017, through January 3, 2018, and from January 3, 2018 until January 6, 2018. (Hadaway Decl. ¶¶ 20–23.)

### 5.    AVN Diagnosis and Treatment

On August 16, 2017, a Mayo Clinic Pulmonologist recommended to FMC Rochester that the facility pursue an orthopedic consultation for Plaintiff's bilateral shoulder pain, possibly related to osteonecrosis of the shoulder joint. (Hadaway Decl. ¶ 24, Ex. R.) The pulmonologist did not specifically mention an MRI. (*Id.*) Defendant Dr. Slater reviewed the pulmonologist's August 16 note on August 21, 2017. (Hadaway Decl. ¶ 25, Ex. S.) At that time, he noted that Plaintiff had a CT scan on March 13, 2017, that raised concern for avascular necrosis. (*Id.*) Treatment started, and Plaintiff was

waiting on physical therapy. (*Id.*) Dr. Slater indicated that he would plan to get x-rays of both shoulders and consider an MRI or bone scan depending on the findings. (*Id.*)

Plaintiff had the bilateral shoulder x-rays on August 22, 2017, and they were negative. (Hadaway Decl. ¶ 26, Ex. T.) Dr. Slater decided to pursue physical therapy as Plaintiff was on medical therapy for osteonecrosis and started duloxetine for treatment of his chronic pain. (*Id.*) On August 30, 2017, a physician's assistant noted that the CT showed bilateral subchondral sclerosis but a recent x-ray did not. (Hadaway Decl. ¶ 27, Ex. U.) He reviewed UpToDate, an online medical reference source, for treatment recommendations, noting that a non-operative treatment was recommended for three months, which had been started. (*Id.*) Dr. Slater thought it would be prudent to pursue more aggressive treatment, so he ordered an MRI of both shoulders and submitted a request for an orthopedic surgery consultation. (*Id.*) Plaintiff had the MRIs on December 12, 2017, which showed he had uncomplicated avascular necrosis of the humeral head. (Hadaway Decl. ¶ 28, Ex. V.)

Since Plaintiff's CT scan in March 2017 that showed some bilateral subchondral sclerosis, medical providers have tried various non-opioid and opioid medications to control Plaintiff's pain. (Hadaway Decl. ¶ 30, Exs. W, X.) Plaintiff was prescribed thirteen different opioid and non-opioid medications to treat his AVN and manage the pain associated with it. (*Id.*) Over time, patients build a tolerance to pain medication, which leads to increased doses, and the possibility of the medication no longer working for them. (Hadaway Decl. ¶ 29.) Therefore, FMC Rochester first attempts to treat an inmate's chronic pain with non-pharmacological modalities such as physical therapy,

11

cognitive behavioral therapy, and transcutaneous electrical nerve stimulation. (*Id.*) If these do not work, non-opioid medications such as acetaminophen, topical analgesics, nortriptyline, duloxetine, and gabapentin are given. (*Id.*) Only if these non-opioid medications are proven to be ineffective at managing the inmate's pain will medical staff explore opioid pain medications such as oxycodone. (*Id.*)

### 6.    Plaintiff's Request for a Lung Transplant

On May 10, 2017, a physician's assistant referred Plaintiff for a general surgical consultation to be "worked up" for a lung transplant, noting one had been recommended in December 2016. (Hadaway Decl. ¶ 32, Ex. Z.) The physician's assistant noted Plaintiff was going through the reduction in sentence process and that the "work up" was intended to have Plaintiff added to the transplant list. (*Id.*)

However, on August 21, 2017, Dr. Slater noted that because Plaintiff's respiratory status was stable, the lung transplant "work up" would be placed on hold. (Hadaway Decl. ¶ 33, Ex. S at 1.) He also noted that Mayo Clinic Pulmonology did not seem to think it was an issue. (*Id.*) On September 12, 2017, Dr. Slater again noted that Plaintiff was "quite stable" and a lung transplant no longer seemed clinically indicated. (Hadaway Decl. ¶ 34, Ex. AA.) He further noted that the referral for a transplant would need to be made by the Pulmonologist, which she did not feel was necessary at that time. (*Id.*)

By letter dated October 31, 2017, the Mayo Clinic Pulmonologist, Defendant Dr. Baqir, indicated that she agreed Plaintiff "will benefit from lung transplantation in the long run." (Hadaway Decl. ¶ 35, Ex. G.) Dr. Slater later clarified that Dr. Baqir intended to say that the letter was for Plaintiff to get the transplant after release from prison, but

Dr. Baqir submitted the recommendation for a transplant consultation in any event. (Hadaway Decl. ¶ 35, Ex. K.) Dr. Slater then submitted a consultation request from FMC Rochester to begin the process. (Hadaway Decl. ¶ 35, Ex. BB.)

Dr. Hadaway disapproved the consultation request on December 13, 2017, noting it was not deemed medically necessary[6] at the time. (Hadaway Decl. ¶ 36, Ex. BB at 4.) Plaintiff's acute fibrinous organizing pneumonia was stable on CellCept and other medication, and he had not had any acute episodes in a significant period of time. (*Id.*)

### E.    Plaintiff's Disciplinary History

#### 1.    BOP Disciplinary Process

The BOP disciplinary process begins with a staff member incident report that explains the facts supporting the alleged violation of the disciplinary codes and forwards the incident report for investigation. (Doc. No. 120, Declaration of Steve Stolarzyk ("Stolarzyk Decl.") ¶ 3, Ex. A at 17.) The investigating officer provides the inmate with a copy of the incident report, ordinarily within twenty-four hours. (*Id.* ¶ 3, Ex. A at 18.)

Upon completion of the investigation, the investigating officer refers the incident report to the Unit Discipline Committee ("UDC") for an initial hearing. (Stolarzyk Decl. ¶ 4, Ex. A at 23.) The initial UDC hearing ordinarily occurs within five work days of the incident report, excluding the time an incident report was referred for possible criminal prosecution. (*Id.* at 24.) If the incident report is not timely heard by the UDC, the Warden

---

[6]    Under BOP Program Statement 6031.04, *Patient Care*, the BOP will consider organ transplantation as a treatment option if it is medically necessary. (Hadaway Decl. ¶ 31, Ex. Y at 45–46.)

must approve the delay. (*Id.*) The UDC can (1) find the inmate committed the prohibited

act, and for certain disciplinary violations, sanction him, (2) find the inmate did not

commit the prohibited act, or (3) refer the incident report to the Disciplinary Hearing

Officer ("DHO") for further hearing. (*Id.* at 23.) If the UDC refers the incident report to

the DHO, it advises the inmate of the rights afforded to him at a DHO hearing. (*Id.* at 25.)

The DHO then holds a hearing, giving the inmate an opportunity to make a

statement and present witnesses and documentary evidence. (Stolarzyk Decl. ¶ 5, Ex. A

at 29–30.) An inmate may also request a staff representative to assist him during the

DHO hearing. (*Id.* at 27–28.) The DHO makes a determination that (1) the inmate

committed the prohibited act, (2) did not commit the prohibited act, or (3) the incident

report should be referred back for further investigation, review, and disposition. (*Id.* at

27.) The inmate receives a written report of the DHO's final decision. (*Id.* at 34.)

## 2.    December 4, 2017 Disciplinary Incidents

Plaintiff has been disciplined thirteen times while incarcerated with the BOP.

(Stolarzyk Decl. ¶ 7, Ex. B.) Plaintiff received two incident reports—Incident Report

No. 3063234 and Incident Report No. 3063319—on December 4, 2017. (*Id.*, Ex. B at 1.)

Neither incident report has been expunged. (*Id.*)

On December 4, 2017, at approximately 1:51 p.m., Plaintiff received a copy of

Incident Report No. 3063234, charging him with a violation of Code 312, insolence

toward a staff member. (*Id.* ¶ 8, Ex. C at 1.) When the incident report was delivered to

Plaintiff, he was advised of his rights during the disciplinary process and acknowledged

those rights. (*Id.* at 2.) Plaintiff was asked if he would like to make a statement, and he

said, "I play with him all the time. I told him he needs his headphones to listen to the TV. She interrupted a conversation between two inmates. I told her to mind her business." (*Id.*) The investigating officer referred the incident report to the UDC for a hearing. (*Id.*)

Defendants Orum and Woltman held a UDC hearing on December 8, 2017, and recommended the incident report be forwarded to the DHO for disposition. (Stolarzyk Decl. ¶ 10, Ex. C at 1.) The DHO did not act on the report and returned it to the UDC for final disposition. (*Id.*) Defendants Orum and Woltman held another UDC hearing on December 13, 2017. (*Id.* ¶ 11, Ex. C at 1.) During this hearing, Plaintiff stated, "I was trying to help the inmate. I did tell her to mind her own business. Everything inmates say is not her business." (*Id.*) Defendants Orum and Woltman discussed with him that it is staff's job to know and listen to inmate conversations and to be aware of inmate interactions. (*Id.*) They found Plaintiff committed the prohibited act and sanctioned him to sixty days loss of commissary. (*Id.*)

On December 4, 2017, at approximately 5:20 p.m., Plaintiff received a copy of Incident Report No. 3063319, charging him with a violation of Code 307, refusing to obey an order of any staff member. (Stolarzyk Decl. ¶ 12, Ex. D at 1.) When the incident report was delivered to Plaintiff, he was advised of his rights during the disciplinary process and acknowledged those rights. (*Id.* ¶ 13, Ex. D at 2.) Plaintiff was asked if he would like to make a statement, and he said, "Whoever wrote this is a liar. I never said, fuck you and your direct order. I said I wasn't moving until I talked to someone about my oxygen." (*Id.*) The investigating officer referred the incident report to the UDC for a hearing. (*Id.*)

15

Defendants Orum and Woltman held a UDC hearing on December 8, 2017, and recommended the incident report be forwarded to the DHO for disposition. (Stolarzyk Decl. ¶ 14, Ex. D at 1.) The DHO did not act on the report and returned it to the UDC for final disposition. (*Id.*) Defendants Orum and Woltman held another UDC hearing on December 13, 2017. (*Id.* ¶ 15, Ex. D at 1.) During this hearing, Plaintiff stated, "I did refuse the direct order, but I never swore at the staff. I just wanted my oxygen. I apologize for my actions." (*Id.*) Because Plaintiff admitted the charge, Defendants Orum and Woltman found Plaintiff committed the prohibited act and sanctioned him to a property restriction for sixty days. (*Id.*)

## F. BOP's Administrative Remedy Program

The BOP has established an administrative remedy procedure whereby inmates can seek formal review of any complaint regarding any aspect of their imprisonment. 28 C.F.R. § 542.10–542.19. In accordance with the BOP's Administrative Remedy Program, an inmate must first attempt informal resolution of his complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. *Id.* § 542.13(a). If the complaint cannot be resolved informally, the inmate may submit a formal written Administrative Remedy Request to the Warden, on a designated form, within twenty days of the event that triggered the inmate's complaint. *Id.* § 542.14. If the inmate's formal request is denied, the inmate may submit an appeal to the appropriate Regional Director of the BOP, within twenty calendar days of the date the Warden signed the response. *Id.* § 542.15(a). A negative decision from the Regional Director may in turn be appealed to the General Counsel's Office (in the Central Office) within thirty calendar days of the

16

date the Regional Director signed the response. *Id.* § 542.15(a). No administrative

remedy appeal is considered to have been fully exhausted until considered by the BOP's

Central Office.

Under certain circumstances, an inmate can bypass informal resolution and file a

Request for Administrative Remedy with the Warden. *See* 28 C.F.R. § 542.14(d). The

inmate may bypass the institution and file with the regional office when he appeals a

Discipline Hearing Officer report, challenges a BOP decision not originating with the

Warden, or reasonably believes the issue is sensitive and his safety or well-being would

be placed in danger if his request became known at the institution. *Id.* § 542.14(d)(1), (2),

(5). Requests that do not meet the "sensitive" standard are not accepted, and the inmate is

advised to pursue the request locally. *See id.* § 542.14(d)(1).

Administrative remedy procedures for inmates alleging violations of the

Rehabilitation Act are outlined in Program Statement 5200.05, *Management of Inmates

with Disabilities*, issued October 17, 2017. (Doc. No. 116, Declaration of Jake Bush

("Bush Decl.") ¶ 10, Ex. B.) After the administrative remedy procedures outlined in

28 C.F.R. §§ 542.10–542.19, inmates must also follow procedures required by the

Department of Justice, found at 28 C.F.R. § 39.170. (Bush Decl. ¶ 10, Ex. B at 10.)

Inmates are directed to file their complaints with the Equal Employment Opportunity

("EEO") Officer in Central Office and include all copies of administrative remedies and

responses received. (*Id.*)

17

## II.    Analysis

### A.    Plaintiff's Claims

Plaintiff brings five causes of action: (1) violation of the First Amendment —
Retaliation; (2) violation of the Eighth Amendment — Deliberate Indifference to a
Serious Medical Need; (3) violation of the Rehabilitation Act, 29 U.S.C. § 794 et seq.;
(4) violation of the Fifth Amendment — Equal Protection Clause; and (5) violation of the
Federal Tort Claims Act ("FTCA"). (Am. Compl. 3–4.) Plaintiff requests declaratory and
injunctive relief as well as compensatory and punitive damages. (*Id.* at 11–12.)

### B.    Standard of Review

Summary judgment is appropriate if, "after viewing the evidence and drawing all
reasonable inferences in the light most favorable to the nonmovant, no genuine issues of
material fact exist and the movant is entitled to judgment as a matter of law." *Johnson v.
Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). In ruling on a motion for
summary judgment, "[t]he evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor," because "[c]redibility determinations,
the weighing of the evidence, and the drawing of legitimate inferences from the facts are
jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
(1986). A disputed fact is material when its resolution "might affect the outcome of the
suit under the governing law," and a factual dispute is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the
court of the basis for its motion and identifying "those portions of the record which it

18

believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001) (quotations omitted). If it does so, the non-moving party may not rest on mere allegations or denials but must point to evidence of "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(c)(1). Conclusory assertions, standing alone, are not enough to create a genuine issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

When deciding a summary-judgment motion, courts liberally construe pro se pleadings and hold them to a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Nevertheless, a pro se plaintiff's claims cannot survive a summary-judgment motion unless he has set forth specific facts demonstrating that there is a genuine issue for trial. *See Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Arguments and statements in briefing are not evidence and cannot create issues of fact for purposes of summary judgment. *See Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 467 n.6 (8th Cir. 2002).

## C.    Federal Defendants

The Federal Defendants argue that Defendant Arroyo should be dismissed because he is immune from suit; Defendants Hyle and Kenney should be dismissed for lack of personal jurisdiction; Defendants Cooper, Cossette, Holbus, Orum, and Revell should be

dismissed for lack of personal involvement in the alleged violations; Plaintiff's First and Fifth Amendment claims should be dismissed on the merits and because the Federal Defendants are entitled to qualified immunity; Plaintiff failed to state an FTCA claim; and any remaining claims are subject to dismissal because Plaintiff did not exhaust his administrative remedies; and that Plaintiff's Eighth Amendment deliberate indifference claim is without merit. (*See* Doc. No. 85, Fed. Defs.' Mem.)

In his response, Plaintiff asks the Court to dismiss his claims against Defendants Kyle, Kenney, Revell, Cossette, Sanson, Arroyo, and Holbus. (Pl.'s Mem. 4.) As a result, it is not necessary to address many of the arguments raised in the Federal Defendants' initial brief, including whether Defendant Arroyo is entitled to immunity or if the Court can exercise personal jurisdiction over Defendants Hyle and Kenney. Instead, the Court will begin its analysis with the Federal Defendants' argument that Plaintiff failed to exhaust his administrative remedies. That argument, if credited, results in the dismissal of all of Plaintiff's claims.

### 1.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This is because

the purpose of the PLRA is to reduce the quantity of prisoner lawsuits by giving prison administration an opportunity to take corrective action in response to a prisoner's grievance, thereby avoiding the need for court intercession. *Id.* at 524–25.

Prisoners must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). The administrative process must be followed from start to finish. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Woodford*, 547 U.S. at 90 (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issue on the merits") (emphasis in original).  When a plaintiff fails to exhaust the administrative remedies available to him before filing a lawsuit, "dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003).

As of July 27, 2018, Plaintiff has attempted to file thirty-six administrative remedies during his incarceration. (Bush Decl. ¶ 15, Ex. C.)[7] Two of those remedies were brought all the way to the Central Office, as required by the BOP Administrative Remedy Program: Administrative Remedy Series 928326 and 938245.

---

[7]   These grievances are catalogued in the Bush Declaration. (Bush Decl ¶¶ 15–69.)

Administrative Remedy Series 928326 was a challenge to discipline Plaintiff received for violating Code 296, Use of the Mail for Abuses Other than Criminal Activity. (Bush Decl. ¶¶ 37–39, Exs. J, K.)[8] This issue does not relate to any of the claims that are raised in this action. Plaintiff complains, for example, about being disciplined for disobeying a staff member, but not about being disciplined for his use of the mail. Plaintiff's pursuit of Administrative Remedy Series 928326 therefore did not exhaust any of Plaintiff's claims. *See Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016) (stating that to satisfy the PLRA's exhaustion requirement, a prisoner's grievance must "alert the prison to the nature of the wrong . . . and provide sufficient information to allow prison officials to take appropriate responsive measures"); *see also Estrada v. Macis*, Case No. 1:15-cv-1292-AWI-SAB (PC), 2017 WL 1160613, at *1 (E.D. Cal. Mar. 29, 2017) ("A prisoner grievance . . . does not exhaust administrative remedies with regard to staff or claims unrelated to the information outlined in the grievance."); *Gibson v. Zavaras*, Civil Action No. 09-cv-2328-WYD-KLM, 2010 WL 3790994, at *5 (D. Colo. Aug. 10, 2010) ("[S]ubmitting unrelated grievances does not properly exhaust a claim regarding a prisoner's particular grievance.").

---

[8]    The Regional Director denied Administrative Remedy 928326-R1, concluding Plaintiff's due process rights were followed during the disciplinary process. (Bush Decl. ¶ 37, Ex. J at 1.) After an initial procedural rejection, Plaintiff submitted his appeal to Central Office, which was assigned Administrative Remedy 928326-A2. (Bush Decl. ¶ 39, Ex. C at 12; *id.* at Ex. K.) Central Office denied Administrative Remedy 928326-A2, concluding that the DHO's decision was supported by some evidence and Plaintiff was afforded his due process rights. (Bush Decl. ¶ 39, Ex. K at 1.)

Administrative Remedy 938245 is a request for push buttons on doors and alert buttons in rooms and showers. (Bush Decl. ¶ 50, Ex. C at 12; *id.* at Ex. N.)[9] This issue arguably relates to Plaintiff's claim for accommodation under the Rehabilitation Act. Plaintiff did not, however, follow the procedures required by the Department of Justice for Rehabilitation Act claims. *See* 28 C.F.R. § 39.170(d)(1)(ii). These procedures must be satisfied in addition to the Administrative Remedy Procedure in 28 C.F.R. § 542. *See Elliot v. Wilson*, No. 15-CV-1908, 2017 WL 1185213, at *14 (D. Minn. Jan. 17, 2017) ("[C]ourts have repeatedly found that the Rehabilitation Act grievance procedure set forth in § 39.170 is 'available' to prisoners and therefore must be exhausted under § 1997e(a).") (collecting cases).

This Court recommends that Plaintiff's claims be dismissed for failure to exhaust his administrative remedies. Even if Plaintiff's failure to exhaust could be excused or

---

[9]    The Warden responded to this grievance by stating that under the Architectural Barriers Act (ABA), automatic doors and alert systems were not required for his housing unit. (Bush Decl. ¶ 50, Ex. N at 1.) Plaintiff appealed the Warden's response to the Regional Office, and his appeal was assigned Administrative Remedy 938245-R1. (Bush Decl. ¶ 51, Ex. C at 13; *id.* at Ex. O.) The Regional Director denied Administrative Remedy 938245-R1, explaining that while automatic doors are permitted, they are not mandatory when manual doors comply with accessibility requirements. (Bush Decl. ¶ 51, Ex. O at 1.) Further, the Regional Director explained that panic buttons were not required under code or Bureau policy. (*Id.*) Plaintiff appealed the Regional Director's denial of Administrative Remedy 938245-R1 to the Central Office, and his appeal was assigned Administrative Remedy 938245-A1. (Bush Decl. 52, Ex. C at 16; *id.* at Ex. P.) Central Office denied Administrative Remedy 938245-A1, concurring with the responses by the Warden and Regional Director. (Bush Decl. ¶ 52, Ex. P at 1.)

This Court also notes that Administrative Remedy 938245 was filed on April 26, 2018, three months after this action was filed. (Bush Decl. ¶ 50, Ex. C at 12.)

overlooked, the Federal Defendants are entitled to summary judgment on Plaintiff's claims for the following reasons.

### 2. There is no Cause of Action under *Bivens* for Plaintiff's Retaliation and Equal Protection Claims

Plaintiff claims that the Federal Defendants disciplined him in retaliation for filing administrative remedy grievances in violation of the First Amendment. (Am. Compl. 4–5.) Plaintiff also claims that the Federal Defendants violated his equal protection rights by denying his request for a "compassionate release," which he claims are given more frequently to Caucasian and Hispanic inmates than African-American prisoners. (*Id.* at 9.)

Plaintiff's claims are brought pursuant to *Bivens v. Six Unknown Fed. Agents*, 403 U.S. 388 (1971), which implied a private right of action for allegations of constitutional violations made against federal employees. In *Bivens*, the Supreme Court created an implied cause of action based on a Fourth Amendment violation. *Bivens*, 403 U.S. at 397. The Court subsequently found the *Bivens* remedy available for violations of an individual's rights under the equal protection component of the Fifth Amendment Due Process Clause and for deliberate indifference to a serious medical condition under the Eighth Amendment. *See Davis v. Passman*, 442 U.S. 228, 230 (1979); *Carlson v. Green*, 446 U.S. 14, 17–19 (1980). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017).

In *Ziglar*, the Court was faced with claims from detainees held on immigration violations after the September 11, 2001 terrorist attacks. Plaintiffs' suit challenged the official policies resulting in their detention and the conditions of confinement they endured while detained. *Id.* at 1852–53. The Court concluded that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857. It held that federal courts should exercise caution before extending the remedy to claims that are meaningfully different than "the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant [*Bivens*]; a claim against a Congressman for firing his female secretary [*Davis*]; and a claim against prison officials for failure to treat an inmate's asthma [*Carlson*]." *Id.* at 1860.

The recognition of a cause of action is context-specific, and the Court has established a rigorous inquiry that courts must use before implying a *Bivens* cause of action in a new context. *See Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). First, courts must ascertain whether a plaintiff's claims arise in a new *Bivens* context. "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court], then the context is new." *Ziglar*, 137 S. Ct. at 1859. The Court held that

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential factors that previous *Bivens* cases did not consider.

25

*Id.* at 1860. If the context is new, then the court must ask whether "any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Finally, courts must also analyze "any special factors counseling hesitation before authorizing a new kind of federal litigation," otherwise known as the "special factors analysis." *Id.* "The Court's precedents now make clear that a *Bivens* remedy will not be available if there are special factors counseling hesitation in the absence of affirmative action by Congress." *Ziglar*, 137 S. Ct. at 1857. The Supreme Court has not defined the phrase "special factors counseling hesitation," but the Court has observed that the "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857–58. Put more simply, to be a "'special factor counseling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858; *see Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 58–59 (E.D.N.Y. 2017).[10]

### a.    Plaintiff's Claims Arise in a New Context

Plaintiff's claim that the Federal Defendants retaliated against him in violation of the First Amendment arises in a new context. The Supreme Court has never recognized a

---

[10]    Applying these factors in *Ziglar*, the Court held that the detention policy claims were not properly brought under *Bivens* because "a *Bivens* action is not a proper vehicle for altering an entity's policy," but the Court remanded the abuse claim for the lower court to consider whether it was appropriate to extend *Bivens* in light of the identified "special factors." *Ziglar*, 137 S. Ct. at 1860, 1869.

*Bivens* remedy for First Amendment claims, and it has affirmatively declined to extend *Bivens* to a claim invoking the First Amendment. *See Wood v. Moss*, 572 U.S. 744, 757 (2014) (acknowledging that the Supreme Court has never recognized an implied damages remedy under the First Amendment); *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) (noting that the Supreme Court has "never held that *Bivens* extends to First Amendment claims"); *Bush v. Lucas*, 462 U.S. 367, 390 (1983) (declining to extend *Bivens* to a claim sounding in the First Amendment); *see also Gonzalez v. Bendt*, No. 4:16-CV-4038-KES, 2018 WL 1524752, at *3 (D.S.D. Mar. 28, 2018) ("Because the Supreme Court has never implied a *Bivens* cause of action for First Amendment retaliation, Gonzalez's claim involves a different constitutional right and is meaningfully different from previous *Bivens* cases.").

Plaintiff's claim that the Federal Defendants violated equal protection also arises in a new context. In *Davis*, the Supreme Court recognized a *Bivens* remedy for a Fifth Amendment equal protection claim, but that case involved discrimination in an employment setting, not a correctional setting. While the claims may have some parallels, "even a modest extension is still an extension." *Ziglar*, 137 S. Ct. at 1864. Prisoner civil rights litigation, moreover, is heavily regulated by Congress, counseling hesitation in the expansion of remedies available to prisoners. *See Woodford*, 548 U.S. at 97 (explaining that the PLRA was "intended to deal with what was perceived as a disruptive tide of frivolous prisoner litigation"); *Alexander v. Ortiz*, Civil Action No. 15-6981 (JBS-AMD), 2018 WL 1399302, at *8 (D.N.J. Mar. 20, 2018) ("Because the prison workplace is an area that is heavily regulated by the legislative and executive branches, and because it is

27

not regarded as an employer/employee relationship, the Court finds that it should be left to those branches to determine whether an action for damages for claims of racial discrimination and retaliation exists.").

### b.    Alternative, Existing Processes are Available to Address Plaintiff's Concerns

The BOP Administrative Remedy Program, discussed above, is an "alternative, existing process" for protecting Plaintiff's interests that provides "a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (declining to recognize a cause of action under *Bivens* where the prisoner had "full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"). Plaintiff's parallel pursuit of his Eighth Amendment claim also counsels against the creation of a new *Bivens* remedy. *Ziglar*, 137 S. Ct. at 1858 (acknowledging that where "an alternative is present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action").

### c.    Special Factors Counsel Against Creating a New Cause of Action

Congress, as noted above, passed the PLRA to reduce the number of frivolous prisoner lawsuits. *See Porter*, 534 U.S. at 524 ("Beyond doubt, Congress enacted [42 U.S.C.] § 1997e(a) to reduce the quantity and improve the quality of prisoner suits."). To achieve that end, Congress required prisoners to pay all filing fees for new civil actions and appeals in installments, required total exhaustion of administrative remedies, allowed

for *sua sponte* dismissal of meritless claims, and barred recovery of damages for mental or emotional injury without a showing of physical injury or commission of a sexual act. *See* 28 U.S.C. § 1915(b); 42 U.S.C. § 1997e(a), (c), (e). The PLRA's restrictive provisions with respect to prisoner litigation are a special factor counseling hesitation when deciding whether to create a new cause of action for prisoners.

Moreover, Plaintiff's retaliation and equal protection claims implicate BOP policies regarding medical treatment, disciplinary proceedings, and housing and cell assignments. BOP officials faced with the expanded possibility of personal liability may act differently with respect to these issues when dealing with inmates in BOP custody. As explained in *Ziglar*, courts should consider defense costs created by claims against federal officials, Congress' "substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government," and "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process." 137 S. Ct. at 1856. These are additional special factors that counsel against creating a new cause of action under *Bivens. See Gonzalez*, 2018 WL 1524752, at *4 (finding that there are "special factors counseling hesitation" to create a *Bivens* remedy because the "cost, time, and energy associated with defending a *Bivens* action brought by an inmate for an action based on retaliation under the First Amendment against a federal employee are significant").

Therefore, Plaintiff cannot recover money damages under *Bivens* for his claims that the Federal Defendants violated his right to equal protection and retaliated against him in violation of the First Amendment.

### 3.    Eighth Amendment

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Whether an official was deliberately indifferent requires both an objective and a subjective analysis." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). The objective prong requires the Plaintiff to "establish he suffered from an objectively serious medical need. Under the subjective prong, Plaintiff must show that an official actually knew of but deliberately disregarded his serious medical need." *Id.* For the subjective prong, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008). "The subjective inquiry must show a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). An inmate "must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010).

Plaintiff's Eighth Amendment claims are discussed in turn.

### a.    Supplemental Oxygen

Plaintiff alleges that the Federal Defendants were deliberately indifferent to his medical needs when they placed him into a SHU cell without supplemental oxygen. (Am. Compl. 5–6.) Plaintiff was given an oxygen concentrator when he was initially placed in the SHU, which was kept outside his locked cell door with the oxygen tubes running under the door. (Hadaway Decl. ¶ 12.) It was later determined upon evaluation, however, that Plaintiff did not need oxygen at rest, an assessment that was confirmed by Mayo Clinic Pulmonology. (*Id.* ¶ 13.) Accordingly, the oxygen concentrator outside Plaintiff's cell was removed, and Plaintiff was given a portable oxygen concentrator for recreation and showers. (*Id.* ¶ 14.) While Plaintiff obviously disagrees about his need for supplemental wall oxygen, or oxygen at rest, Plaintiff's disagreement with the judgment of the medical professionals who treated him is not enough to create an issue of fact as to whether the Federal Defendants were deliberately indifferent to his medical needs. *See Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (stating that an inmate's "mere disagreement" with the course of his medical treatment fails to state a claim of deliberate indifference).

### b.    Placement in General Population SHU

Plaintiff claims the Federal Defendants violated the Eighth Amendment when they placed him in general population SHU. (Am. Compl. 6.) As discussed in the previous section, however, the Federal Defendants determined that Plaintiff's medical needs could be met in the general population SHU with either an oxygen concentrator placed outside

of his cell door or a portable oxygen container for showering and recreational use. (Hadaway Decl. ¶¶ 12–14.)

To bolster this claim, Plaintiff alleges that he lost consciousness on December 4, 2017, the day he was placed in general population SHU; that he experienced pain and shortness of breath on a later date; and that he lost consciousness again on another occasion. (*See* Am. Compl. 12–13; *see also* Doc. No. 133, Pl.'s Mem. 8–9, Ex. F.) The record before this Court does not support Plaintiff's version of events. The BOP Health Services Clinical Encounter relating to the December 4 incident, for example, states that Plaintiff was laying on his stomach, still breathing, and he was "Pretending to pass out." (Pl.'s Mem. Ex. F; Hadaway Decl. ¶ 17, Ex. L.) The second incident was caused by chest wall tenderness, which is a complication of his medical condition that could have occurred if he had been housed in a different location at FMC Rochester. (Hadaway Decl. ¶ 18, Ex. M.) And the third incident was due to hypoglycemia, which also could have occurred in a different location at FMC Rochester and was unrelated to the level of oxygen available for Plaintiff's alleged medical needs. (Hadaway Decl. ¶ 19, Ex. N.)

Even if Plaintiff's version of events were entirely correct, it still would not amount to an Eighth Amendment violation. The Federal Defendants, as noted above, were cognizant of Plaintiff's condition and determined the appropriate level of oxygen for his needs. In other words, Plaintiff was not ignored, and the alleged fact that there was an error in judgment does not amount to criminal recklessness. *See, e.g.*, *Washington v. Esch*, 8:17CV6, 2017 WL 5195208, at *7 (D. Neb. Nov. 9, 2017) ("The Eighth Circuit has held that prison medical professionals do not act with deliberate indifference where,

32

as here, they do not ignore a prisoner's complaints but exercise independent medical judgment and attempt to treat them in a manner other than the precise manner the prisoner requests.") (citing *Logan v. Clarke*, 119 F.3d 647, 649–50 (8th Cir. 1997); *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015)); *Carney v. Karas*, Civil No. 16-5214, 2017 WL 5492006, at *6 (W.D. Ark. Oct. 25, 2017) ("A prison doctor's medical judgment on how to best diagnose or treat a prisoner, even if negligent or in error, does not constitute deliberate indifference.") (citing *Estelle*, 429 U.S. at 105–06).

The Federal Defendants were not deliberately indifferent to Plaintiff's medical needs by placing him in general population SHU.

### c.    Electric Wheelchair

As noted above, Plaintiff did not have access to an electric wheelchair while he was in the SHU, from December 4, 2017, through January 3, 2018, and from January 3, 2018, until January 6, 2018. (Hadaway Decl. ¶¶ 20–23, Ex. Q.) Plaintiff did not need an electric wheelchair while he was in the SHU because he was primarily confined to his cell. (Hadaway Decl. ¶ 21.) Therefore, the Federal Defendants did not deliberately disregard a serious medical need during this time period, and Plaintiff's argument to the contrary once again represents a disagreement with his course of treatment. *See Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) ("[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent judgment.").

With respect to the three days between January 3 and 6, 2018, Defendant Arroyo requested an evaluation because Plaintiff's pulmonary condition had improved, and

therefore, there appeared to be no clinical need for a wheelchair. (Hadaway Decl. ¶ 22, Ex. P.) The Federal Defendants did not act with deliberate indifference by requesting an evaluation due to an apparent change to Plaintiff's medical condition. *See Goodson v. Evans*, 438 F. Supp. 2d 199, 202 (W.D.N.Y. 2006) (finding no deliberate indifference where correctional staff changed course of treatment and "[t]here is *no* evidence, however, that those changes were incorrect or medically inappropriate") (emphasis in original).[11]

### d.    AVN Diagnosis and Treatment

Plaintiff received extensive treatment for his AVN, including x-rays, an MRI, and physical therapy. (Hadaway Decl. ¶¶ 24–28.) Also, when Dr. Slater initiated the treatment plan in August 2017, Plaintiff was prescribed seven different medications to treat the AVN and manage the pain associated with it, and in November 2017, Plaintiff received three additional medications. (*Id.* ¶¶ 29, 30, Exs. W, X.) Plaintiff complains that the Federal Defendants initially disregarded a recommendation from the Mayo Clinic that he should have an MRI, and that Defendant Dr. Slater knew that an x-ray was insufficient to see AVN. (Am. Compl. 7.) Plaintiff, however, eventually received MRIs on both

---

[11]    The Court notes that Plaintiff appears to have abandoned this claim because he asked the Court to dismiss his claims against Defendant Arroyo. (Pl.'s Mem. 4.) Moreover, Defendant Arroyo, an Occupational Therapist, is entitled to absolute immunity because he is a commissioned officer with the U.S. Public Health Service. *See Hui v. Castaneda*, 559 U.S. 799, 806 (2010) (explaining that 42 U.S.C. § 233(a) "grants absolute immunity to PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct").

shoulders in December of 2017. (Hadaway Decl. ¶ 28.) Therefore, the Federal

Defendants did not act with deliberate indifference with respect to Plaintiff's AVN.

### e.    Lung Transplant

Finally, Plaintiff alleges that the Federal Defendants were deliberately indifferent

to his medical needs by refusing to give him a lung transplant, without which he "will

soon die." (Am. Compl. 8.) In Dr. Hadaway's opinion, however, a lung transplant for

Plaintiff is not "medically necessary." (Hadaway Decl. ¶ 36; Hadaway Decl. ¶ 31, Ex. Y

at 45–46 (stating that the BOP will consider organ transplantation as a treatment option if

it is medically necessary).) As of December 13, 2017, Plaintiff's "acute fibrinous

organizing pneumonia was stable on CellCept and other medication, and he had not had

any acute episodes in a significant period of time." (Hadaway Decl. ¶ 36.) Therefore, the

Federal Defendants were not deliberately indifferent to an objectively serious medical

need. *See Garcia v. Anderson*, No. 08-4731 (ADM/JJG), 2009 WL 2900304, at *6 (D.

Minn. Sept. 2, 2009) (finding no objectively severe medical need for a liver transplant

when the plaintiff's "treatment regimen has proven adequate for his condition and that his

condition has remained stable").

In sum, the Federal Defendants should be granted summary judgment on

Plaintiff's Eighth Amendment Claims.

### 4.    FTCA Claim

The FTCA gives federal district courts "exclusive jurisdiction of civil actions on

claims against the United States, for money damages, . . . for . . . personal injury or death

caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). By invoking the FTCA, Plaintiff appears to be asserting a medical malpractice claim against the United States under Minnesota state law.[12]

To establish a prima facie case of medical negligence under Minnesota law, Plaintiff must produce an affidavit stating that the case has been reviewed by a qualified health care provider, meaning a physician, surgeon, or dentist has concluded the defendant deviated from the applicable standard of care, and by that action, caused injury to the claimant. *See* Minn. Stat. § 145.682, subd. 3. Plaintiff has not provided an expert affidavit despite a written demand from the United States. *See* Minn. Stat. § 145.682, subd. 6(a); (Doc. No. 45, Ex. A). In his response to the Federal Defendants' summary-judgment motion, Plaintiff offers no argument about the necessity of an expert affidavit in this case. *See Flores v. United States*, 689 F.3d 894, 900 (8th Cir. 2012) (explaining that "[a] plaintiff's failure to provide an expert affidavit may be excused only if: (1) expert testimony is not needed to establish negligence; or (2) if the plaintiff shows

---

[12]    The United States "has not rendered itself liable under § 1346(b) for constitutional tort claims." *FDIC v. Meyer*, 510 U.S. 477, 478 (1994). *See also In re Franklin Savings Corp.*, 385 F.3d 1279, 1288 (stating that "state law determines whether there is substantive liability under the FTCA").

excusable neglect in failing to timely serve the affidavits"). Therefore, the United States is entitled to summary judgment on Plaintiff's FTCA claim.[13]

### D.    Mayo Defendants

Plaintiff's allegations against the Mayo Defendants, discussed above, appear to be limited to the following: Plaintiff received treatment at the Mayo Clinic from Dr. Baqir; Dr. Baqir recommended in August 2017 that Plaintiff should have an MRI and see an orthopedist, but his recommendation was ignored; and the Mayo Defendants, along with Dr. Slater, Dr. Hadaway, and the BOP, have "consistently blocked the plaintiff from receiving a lung transplant, without such the plaintiff will soon die." (Am. Compl. 8.)

These allegations could be construed as stating an Eighth Amendment claim, but not a First Amendment retaliation claim or an equal protection/due process claim. Moreover, the Mayo Clinic is a private entity and Dr. Baqir works for the Mayo Clinic, not the BOP.[14] Therefore, Plaintiff cannot bring any *Bivens*-type claims against the Mayo Defendants. *See Gilbert v. United States*, 306 F. Supp. 3d 776, 788 (D. Md. 2018) ("*Bivens* actions . . . cannot be brought against private actors or corporations, even when they are so closely aligned with federal officers that it might be said that they are acting under color of federal law.") (citing *Minneci v. Pollard*, 565 U.S. 118, 120 (2012);

---

[13]    The Federal Defendants, as noted above, argue that Plaintiff's claim under the Rehabilitation Act should be dismissed for failure to exhaust administrative remedies, but they have not offered any additional argument with respect to the merits of that claim. The Mayo Defendants do address the merits of Plaintiff's Rehabilitation Act claim, and the Court's discussion of that claim below should apply with equal force to the Federal Defendants.

[14]    (*See* Doc. No. 66, Declaration of Misbah Baqir; Doc. No. 67, Declaration of Paul Pigsley.)

*Malesko*, 534 U.S. at 71–72). Even if such claims could be brought against the Mayo Defendants, as stated above, there is no cause of action under *Bivens* for Plaintiff's retaliation and equal protection claims. Finally, Plaintiff's complaints about his AVN treatment and not receiving a lung transplant, discussed above, cannot state a claim for deliberate indifference under the Eighth Amendment.

Plaintiff also brings a claim under the Rehabilitation Act. *See* 29 U.S.C. § 794(a). To prevail on such a claim, a plaintiff must demonstrate that he is a qualified individual with a disability, he was denied the benefits of a program or activity of a public entity which receives federal funds, and he was discriminated against based on his disability. *Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998). Plaintiff does not claim that he was discriminated against because of a disability. Instead, Plaintiff claims that he was discriminated against because he is a prisoner, which is not sufficient to state a claim under the Rehabilitation Act. (*See* Am. Compl. 8–9 ("Because he is incarcerated, plaintiff has constantly been told that he would not get a transplant while in the BOP custody.").); *Van Over v. DeWalt*, CIV.A. 06-CV-192-JMH, 2007 WL 956670, at *9 (E.D. Ky. Mar. 28, 2007) (dismissing Rehabilitation Act claim because prisoner alleged "that any discrimination against him was based upon his status as an inmate, not because of any disability").[15]

---

[15]    The Court also notes that Dr. Baqir cannot be held liable under the Rehabilitation Act in his individual capacity. *See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634 (8th Cir. 2014) ("This court affirms the dismissal of the individual-capacity claims against Lange and Logan. They cannot be sued in their individual capacities under the ADA or the [Rehabilitation Act].").

Plaintiff's final claim is a claim under the FTCA. To the extent that Plaintiff is attempting to bring a medical malpractice claim against the Mayo Defendants, this claim must be dismissed because, as noted above, Plaintiff did not produce an expert affidavit as required by Minnesota state law. *See* Minn. Stat. § 145.682, subd. 3.

## III.    Recommendation

For the reasons stated above, and based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    The Mayo Defendants' Motion for Summary Judgment (Doc. No. 63) be **GRANTED**;

2.    The Federal Defendants' Motion for Summary Judgment (Doc. No. 82) be **GRANTED**; and

3.    Judgment be entered accordingly.


Date: December 11, 2018.                     *s/ Becky R. Thorson*_____
                                             BECKY R. THORSON
                                             United States Magistrate Judge


### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).